IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


| | | |
|---|---|---|
| MICHAEL GOODWIN, | ) | CASE NO.  1:99CV2963 |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Judge John M. Manos |
| | ) | |
| DAVID JOHNSON, WARDEN, | ) | |
| | ) | |
| Respondent. | ) | <u>MEMORANDUM OF OPINION</u> |


On June 12, 2000, Michael Goodwin, petitioner, filed a petition for writ of habeas corpus

pursuant to 28 U.S.C. § 2254 (Docket No. 13).  He challenges his convictions for  aggravated

murder with prior calculation and aggravated felony murder, aggravated robbery, and possession

of a firearm while under disability.  He also challenges his sentence of death imposed on the

aggravated murder counts by the Court of Common Pleas for Cuyahoga County, Ohio, which

was imposed following a jury recommendation.  The parties have fully briefed these issues.

For the following reasons, the petition is GRANTED IN PART and DENIED IN PART.

I.  FACTS

A.  Factual Basis For Convictions and Sentence

The Ohio Supreme Court summarized the factual basis for the Petitioner's convictions

and sentence in State v. Goodwin, 84 Ohio St. 3d 331, 331-33 (1999), cert. denied, 528 U.S. 846

(1999).

On September 13, 1994, appellant Michael Goodwin, James Padgett, and James Johnson
robbed the Big Star Market at East 55th Street and Quimby Avenue in Cleveland. During the
course of the robbery, Mustafa Sammour, a store clerk, was fatally shot.

Between 8:55 and 9:10 a.m. on the morning of the robbery, a milk truck driver, Lawrence
Austin, saw two men exit the market and run down the street. Subsequently, Austin saw
Goodwin, wearing a shirt with the number "7" on it, also exit the market. Austin observed that
Goodwin dropped some money on the ground while trying to put the money in his pocket.
Austin retrieved the dropped money and took it inside the market, giving it to one of the clerks.
Once inside the market, Austin saw one clerk, Mustafa, lying on the floor. Almohannad
Sammour, another clerk, stated to Austin, "[T]hey shot my cousin." Two bystanders also
witnessed the three men running down the street from the market. Marilyn Rox, who knew
Goodwin, identified him as one of the men running.

Later the same morning, Goodwin called Tyrone Griffin and asked him to dispose of a
bag. Griffin retrieved a bag from Goodwin containing trousers and a shirt with the number "7"
on it. Padgett testified that Goodwin's clothes were stained with blood. Griffin destroyed the
clothing.

At the crime scene, the police found Mustafa's body behind a counter. Blood was
splattered about the area near his body. On the counter, the police found twelve one-dollar bills.
Detectives also discovered a copper-jacketed bullet in the refrigeration area of the store, near
Mustafa's body. A forensics expert later concluded that the bullet had been fired from either a .
357 Magnum or .38 caliber revolver. Near the floor by the safe, detectives found a bullet hole
and fragments of a second bullet. About two weeks prior to the robbery, Jermaine Brown, a
friend of the appellant, had sold the appellant a .357 Magnum revolver.

Dr. Martha Steinberg, a forensic pathologist, found that Mustafa Sammour died as a
result of a gunshot wound to the left forehead. The wound was described as a "through and
through" gunshot wound, causing such extensive injury to Mustafa's brain and skull that, in the
words of Steinberg, "death was virtually immediate." Steinberg further stated that the impact of
this type of wound would be so forceful that the shooter could possibly have had blood and
remains of the victim's brain splattered onto him.

On September 14, the police arrested Goodwin. After advising him of his rights, he told police that he alone robbed the market and that Johnson and Padgett were customers. He stated that he pointed his gun at the "Arab clerk" and ordered him to take him, Goodwin, to the safe. Goodwin further stated that after Mustafa said something, "the gun just went off." Upon further questioning, Goodwin stated that he confronted the other clerk, Almohannad. Almohannad took him to the safe, where, according to Goodwin, the gun "just went off" again. Before he left the store, Goodwin took money from the safe and the cash register.

Two days later police again interviewed Goodwin. He changed his previous statement by naming Johnson and Padgett as accomplices. He claimed that Padgett was armed with the .357 Magnum revolver, that he had a .45 automatic handgun, and that Johnson was unarmed. Goodwin claimed that Padgett had shot the clerk. While in jail, however, Goodwin confided to Antoine Robinson, another inmate at the jail, that he had shot Mustafa. He also told Johnson that he would blame the killing on Padgett, as Padgett was the only one among the three robbers who did not have children.

Goodwin was charged with aggravated murder in violation of R.C. 2903.01(A), with felony murder and firearm specifications; aggravated murder in violation of R.C. 2903.01(B), with felony murder and firearm specifications; aggravated robbery in violation of R.C. 2911.01(A)(1); and with having a weapon while under disability in violation of R.C. 2923.13. Padgett and Johnson were both offered plea agreements in exchange for their testimony against Goodwin.

At trial, the following testimony was adduced. Derrick Flonnory, a friend of the appellant, testified that the appellant stopped at his house around 8:15 or 8:30 on the morning of the robbery. Goodwin wanted Flonnory to help him rob the market, but Flonnory declined. Padgett and Johnson testified that Goodwin suggested to them that they rob the market. Both Padgett and Johnson testified that Goodwin was carrying the .357 Magnum revolver prior to entering the store. When the three men arrived at the market, Goodwin went inside first. All three men wore hats pulled down over the faces.

After entering the market, Padgett and Johnson confronted Almohannad. Goodwin confronted Mustafa. Mustafa had his hands up. There was no testimony that he resisted in any way. While Mustafa stood with his arms raised above his head, Goodwin shot Mustafa in the head. After Goodwin shot Mustafa, he pointed the gun at Almohannad's head and ordered him to take Goodwin to the safe. Almohannad offered no resistance and pleaded with Goodwin not to shoot him. Almohannad then opened the safe and gave Goodwin the money. While Almohannad was giving Goodwin the money, Goodwin fired a shot into the floor, retrieved money from the cash register, and then exited the market with Johnson and Padgett.

Testimony by Almohannad, Mustafa's cousin, generally corroborated that of Johnson and Padgett. When the three men came into the store, Almohannad recognized Johnson and Goodwin as regular customers. Subsequently, Padgett grabbed Almohannad from behind. Almohannad stated that both Johnson and Goodwin were armed. However, Almohannad did not see who fired

the shot that killed Mustafa.

Following the robbery, the three men went back to Goodwin's house, where Goodwin divided the money. Goodwin gave the men approximately one hundred thirty dollars each, and kept the rest for himself. In his statement to the police, Goodwin admitted stealing approximately five hundred dollars.

During cross-examination, Padgett and Johnson admitted that their testimony conflicted with their original sworn statements to authorities. For example, Johnson first told police that he had no gun, but, at trial, he testified that he was armed with a .45 caliber pistol. Also both Padgett and Johnson told police that they had never received any money from the robbery, when in fact Goodwin had split the proceeds with them.

The defense presented no evidence. Rather, the defense argued that a reasonable doubt existed as to whether Goodwin shot Mustafa.

The jury convicted Goodwin, as charged, of aggravated murder with prior calculation and design, aggravated felony-murder, aggravated robbery, and possession of a firearm while under a disability. Both murder counts contained a death penalty specification.

The defense presented no evidence at the penalty hearing. The jury recommended the death penalty. Prior to the trial court's passing sentence, Rosetta Goodwin, Goodwin's aunt, stated that Goodwin did not deserve the death penalty because he was born drug dependent and because his mother abandoned him when he was nine. Goodwin apologized to the victim's family. He stated that he did not intend to kill Mustafa, claiming that he hit Mustafa with the gun,
and the gun went off. Goodwin also admitted to the trial judge that he took Mustafa's life, saying, "I did take the man's life, but I confess up to my crimes."

The trial judge sentenced Goodwin to death on the counts of aggravated murder. Goodwin received additional sentences of ten to twenty-five years on the count of aggravated robbery, and one and one-half years on the weapon disability count, with an additional three years imposed pursuant to a firearm specification. On appeal, the court of appeals affirmed the convictions and sentences.

    B.  <u>Procedural History of the Current Petition</u>

On June 12, 2000, the Petitioner filed the current petition for writ of habeas corpus

pursuant to 28 U.S.C. § 2254 (Docket No. 13).  He alleges the following twelve grounds for

relief.

-4-

First Ground for Relief: Petitioner was denied his right to the effective assistance of counsel at the penalty phase of this capital case as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

Second Ground for Relief: Petitioner was denied his right to the effective assistance of counsel during the trial phase of this capital case as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

Third Ground for Relief: Petitioner's rights under the Eighth and Fourteenth Amendments to the United States Constitution were violated when the trial court instructed the jurors to weigh aggravating circumstances from separate counts of aggravated murder against a single set of mitigation evidence.

Fourth Ground for Relief: When the trial court considers aggravating circumstances from separate counts of aggravated murder against a single set of mitigation evidence and also considers both the principal offender and prior calculation and design aspects of the specification, Petitioner's rights under the Eighth and Fourteenth Amendments to the United States Constitution were violated.

Fifth Ground for Relief: Petitioner's rights under the Eighth and Fourteenth Amendments to the United States Constitution were violated during his capital trial when the Prosecutor emphasized irrelevant victim-impact evidence and asserted personal knowledge of facts that the jury needed to decide.

Sixth Ground for Relief: Petitioner's rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated when two of the jurors at his capital trial had indicated during voir dire that they could not dispassionately consider the evidence and that they could not be fair and impartial jurors.

Seventh Ground for Relief: When a trial court receives and considers a victim's request for the death penalty, a resulting sentence of death is unreliable in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

Eighth Ground for Relief: Where the State fails to present evidence of a deliberate plan to kill there is constitutionally insufficient evidence to sustain a conviction for a killing with prior calculation and design and the resulting conviction violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

Ninth Ground for Relief: When the trial court instructs the jury on the definition of "reasonable doubt" and allows the jury to return convictions based upon a degree of proof below that required by the Due Process Clause of the Fourteenth Amendment, the defendant is denied the right to a jury verdict guaranteed by the Sixth Amendment to the United States Constitution.

Tenth Ground for Relief: Petitioner was denied his Due Process Rights to a fair trial guaranteed under the Sixth and Fourteenth Amendments to the United States Constitution when the trial court's jury instructions allowed the jurors to return convictions based upon a negligence standard.

Eleventh Ground for Relief: Petitioner was deprived of his rights of Due Process, to a fair trial and against cruel and unusual punishment under the Fourteenth Amendment to the United States Constitution when the trial court failed to instruct the jury on the lesser included offense of Involuntary Manslaughter.

Twelfth Ground for Relief: Petitioner's rights under U.S. Const. Amends. V, VI, VIII, and XIV were violated because Ohio's death penalty statute is unconstitutional on its face and as applied to Petitioner.

On August 15, 2000, the Respondent filed his Return of Writ (Docket No. 25), to which the Petitioner answered in his Traverse on November 7, 2000 (Docket No. 41).

Pursuant to a motion by the Petitioner, on May 10, 2001, the Court held an evidentiary hearing regarding the Petitioner's First Ground for Relief, his claim for ineffective assistance of counsel during the penalty phase of his trial.  Subsequently, the parties submitted post-hearing briefs on the issues (Docket Nos. 63, 64, and 65).

On May 15, 2003, the Petitioner filed a motion to stay proceedings to afford him an opportunity to exhaust a claim in the state courts pursuant to Atkins v. Virginia, 112 S. Ct. 2242

-6-

(2002).  On June 2, 2003, the Court granted the motion.  The state courts ruled adversely to the Petitioner on the <u>Atkins</u> issues, and on March 26, 2004, the Court lifted the stay.  All relevant issues have now been briefed.

## II.  GENERAL HABEAS STANDARDS

On April 26, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ( the "Act" or the "AEDPA"), Pub. L. 104-132, 110 Stat. 1214 (1996).  The legislation was aimed, *inter alia*, at "curb[ing] the abuse of the statutory writ of habeas corpus, and [was designed] to address the acute problems of unnecessary delay and abuse in capital cases."  H.R. Conf. Rep. No. 518, 104th Cong., 2d Sess. (1995), reprinted in 1996 U.S.C.C.A.N. at 944 *et seq.*

Title 28 U.S.C. § 2254, as amended by the AEDPA, provides in relevant part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --

> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> > (2) resulted in a decision that was based upon an unreasonable determination of facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d) (as amended).  With respect to paragraph (d)(1), the phrase "clearly established Federal law, as determined by the Supreme Court of the United States" refers to Supreme Court holdings, not dicta.  In addition:

> > Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this

> Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams v. Taylor, 120 S. Ct. 1495, 1523 (2000); see also  Miller v. Francis, 269 F.3d 609, 613-14 (6th Cir. 2001); Brumley v. Wingard, 269 F.3d 629, 637-38 (6th Cir. 2001); Magana v. Hofauer, 263 F.3d 542, 546 (6th Cir. 2001).

State court factual determinations are "presumed to be correct," and the party seeking habeas relief has the burden of rebutting this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); Bailey v. Mitchell, 271 F.3d 652, 656 (6th Cir. 2001); Brumley, 269 F.3d at 637.  This presumption applies to factual findings of a state appellate court made based on the trial court record. Brumley, 269 F.3d at 637.

## III. ANALYSIS

### A.  Exhaustion and Procedural Default

The Respondent argues that many of the Petitioner's claims are barred from review under the doctrine of "procedural default".  Generally, a Petitioner must exhaust state court remedies before seeking habeas relief in federal court.  28 U.S.C. § 2254(b)(1)(A); Lott v. Coyle, 261 F.3d 594, 601 (6th Cir. 2001), cert. denied, 2002 WL 233467 (2002); Coleman v. Mitchell, 244 F.3d 533, 538 (6th Cir. 2000), cert. denied, 122 S. Ct. 405 (2001).  The exhaustion requirement is satisfied when the state's highest court had a full and fair *opportunity* to review the Petitioner's claims.  Thus, a claim is exhausted if presented to the highest state court, even if the court decided not to address the claim on the merits.  Stanford v. Parker, 266 F.3d 442, 451 (6th Cir 2001), cert. denied, 537 U.S. 831 (2002); Manning v. Alexander, 912 F.2d 878, 881 (6th Cir.

-8-

1990).  To be exhausted, a claim must have been presented in state court under the same theory or basis under which it is later presented in federal court.  <u>Wong v. Money</u>, 142 F.3d 313, 322 (6th Cir. 1998).

Even if a claim has been presented to the highest state court, it may still be "procedurally defaulted".  Ordinarily, a federal court will not consider defaulted claims unless the Petitioner can show cause for the procedural default in the state court, and actual prejudice as a result. <u>Keeney v. Tamayo-Reyes</u>, 504 U.S. 1, 6-9 (1992); <u>Stanford</u>, 266 F.3d at 451.  The Sixth Circuit has adopted the following test for analyzing procedural default (named the *Maupin* test after the case in which it was established):

> First, the court must determine (1) whether there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule; (2) whether the state courts actually enforced the state procedural sanction; (3) whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim. If the answer to these questions is yes, then the court must inquire into whether the petitioner can obtain habeas relief by demonstrating . . . that there was cause for him not to follow the procedural rule and that he was actually prejudiced by the constitutional error. [Citations omitted.]

<u>Manning v. Huffman</u>, 269 F.3d 720, 724 (6th Cir. 2001), <u>citing</u>, <u>Maupin v. Smith</u>, 785 F.2d 135, 138 (6th Cir. 1986); <u>see</u> <u>also</u>, <u>e.g.</u>, <u>Williams v. Coyle</u>, 260 F.3d 684, 693 (6th Cir. 2000); <u>Jacobs v. Mohr</u>, 265 F.3d 407, 417 (6th Cir. 2001); <u>Coleman</u>, 244 F.3d at 539.

In the absence of cause and prejudice for defaulting a claim, a federal habeas court will consider a defaulted claim only if not doing  so will result in a "fundamental miscarriage of justice".  <u>Coleman v. Thompson</u>, 501 U.S. 722, 750 (1991); <u>Williams</u>, 260 F.3d at 693; <u>Stanford</u>, 266 F.3d at 451-52; <u>Coleman</u>, 244 F.3d at 539.  A fundamental miscarriage of justice can be shown by demonstrating that the trial  resulted in the conviction of one who is "probably

innocent".  Stanford, 266 F.3d at 451-52.  In addition, a federal court may *deny* relief on the

merits as to non-exhausted claims.  28 U.S.C. § 2254(b)(2).

The Respondent does not deny that all claims are exhausted.  However, he argues that the

Petitioner's Third, Fifth, Tenth, and Eleventh Grounds for Relief are procedurally defaulted.  As

to each, the Ohio Supreme Court has ruled previously that these claims were waived during

appellate proceedings.

The Petitioner argues as cause for the default that his counsel was constitutionally

ineffective for not properly raising these issues in the state courts.  Ineffective assistance of

counsel can be cause for procedural default.  Murray v. Carrier, 477 U.S. 478, 488 (1986).  The

parties' briefing on the default issue is scant.  For completeness, therefore, the Court will address

all claims on the merits, which moots the Respondent's arguments for procedural default.

B.  Ineffective Assistance of Counsel

In the First and Second Grounds for Relief, the Petitioner asserts claims for ineffective

assistance of counsel during both the guilt and penalty phases of his trial.  The standard for

determining whether counsel was ineffective was set forth by the United States Supreme Court

in Strickland v. Washington, 466 U.S. 668 (1984).  "The benchmark for judging any claim of

ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the

adversarial process that the trial cannot be relied on as having produced a just result."  Id. at 686;

see also United States v. Sanchez, 960 F.2d 610, 612 (6th Cir. 1992).  "When a true adversarial

criminal trial has been conducted — even if defense counsel may have made demonstrable errors

— the kind of testing envisioned by the Sixth Amendment has occurred."  United States v.

Cronic, 466 U.S. 648, 657 (1984).  The Court does not view the purported errors in isolation.

-10-

Rather, the Court views the errors within the context of the entire record to determine whether the errors, taken as a whole, were so egregious as to undermine the fundamental fairness of the trial.  Lundy v. Campbell, 888 F.2d 472-73 (6th Cir. 1989), cert. denied, 495 U.S. 950 (1990).

The analysis of counsel's performance is two-prong:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed to the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant can make both showings, it can not be said that the conviction . . .  resulted from a breakdown in the adversary process that renders the result unreliable.

Strickland, 466 U.S. at 687; see also West v. Seabold, 73 F.3d 81, 84 (6th Cir.), cert. denied, 116 S. Ct. 2569 (1996); Fields v. Bagley, 275 F.3d 478, 484 (6th Cir. 2001); Buell v. Mitchell, 274 F.3d 337, 359 (6th Cir. 2001); Greer v. Mitchell, 264 F.3d 663, 674 (6th Cir. 2001);  Ward v. United States, 995 F.2d 1317, 1321 (6th Cir. 1993); United States v. Morrow, 977 F.2d 222, 229 (6th Cir. 1992), cert. denied, 508 U.S. 975 (1993).

The performance inquiry is whether counsel's assistance was reasonable considering all the circumstances.  Strickland, 466 U.S. at 688.  The Court "must indulge a strong presumption" counsel's assistance was reasonable, and avoid the "distorting effects of hindsight".  Id. at 689; see also Stanford v. Parker, 266 F.3d 442, 454 (6th Cir. 2001).  A claim of unreasonable performance must be evidenced by more than unsupported generalizations.  Vick v. United States, 730 F.2d 707, 708 (11th Cir. 1984).  Rather, a petitioner must point to specific acts or omissions that fell outside the wide range of competent assistance.  Patel v. United States, 19 F.3d 1231, 1235 (7th Cir. 1994).  Counsel's performance is to be measured at the time of the

representation.  Stanford, 266 F.3d at 454.  Furthermore, the Petitioner bears the burden of overcoming a presumption that the challenged conduct might be considered sound trial strategy.  Miller v. Francis, 269 F.3d 609, 615 (6th Cir. 2001).

Prejudice is demonstrated when there is a reasonable probability that but for counsel's errors, the result would have been different.  A "reasonable probability" is one sufficient to undermine confidence in the outcome.  Strickland, 466 U.S. at 694.  The Court determines prejudice with attention to whether the result of the proceeding was fundamentally unfair or unreliable.  Lockhart v. Fretwell, 506 U.S. 364, 369 (1993).  "Unreliability does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him."  Id. at 372.

### 1.  Ineffective Assistance During the Penalty Phase

In the First Ground for Relief, the Petitioner asserts that his counsel provided ineffective assistance during the penalty phase of his trial by not presenting an adequate mitigation case.  On May 10, 2001, the Court held a hearing on the Petitioner's claim for ineffective assistance of counsel during the penalty phase.  The Petitioner called the following witnesses: (1) Patrick D'Angelo, co-counsel at trial;[1] (2) Dorian Hall, a supervisor in the mitigation and criminal sections of the Ohio Public Defender's Office; and (3) Dr. Jeffrey Smalldon, a clinical and forensic psychologist. [2]

---

[1]    The Petitioner's other counsel was Tom Shaughnessy.  At the time of the mitigation hearing, Mr. Shaughnessy had been dead for approximately four years. (Hearing Tr. at 16.)

[2]    By stipulation, the Court also admitted the report and deposition of an investigator, David Hicks, and a medical report and deposition of Dr. Laurel Schauer, a clinical psychologist who examined the Petitioner in 1990 at age

Both of the Petitioner's attorneys had extensive experience in death penalty cases at the time of trial.  Mr. D'Angelo testified that the evidence of the Petitioner's guilt was strong.  He had confessed to his involvement and implicated his accomplices, and there was additional eye-witness and scientific evidence.  His counsel, therefore, made a strategic decision to concentrate on avoiding the death penalty.  Counsel understood that the jury would need to weigh any aggravating factors against any mitigating factors.  One of the aggravating factors was the brutality of the crime.

The Petitioner also had a prior criminal history as a juvenile, which included other armed robberies.  Some of the alleged prior crimes never resulted in actual charges.  His actual juvenile adjudications of crime included offenses for criminal trespass, felony drug abuse, and an adjudication of delinquency for two robberies.  Some of those adjudications, including the robberies, resulted from pleas to amended charges, presumably amendments down from more serious offenses.  (Hearing Tr. at 18-19, 31-33, 43-44.)

Counsel, however, did not employ a psychologist to examine whether the Petitioner's mental history, condition, or background could mitigate the crime.  Counsel also did not examine school or medical records, and interviewed few family members.  Beyond argument, no additional mitigation evidence was presented.  Instead, the strategy was to argue residual doubt as to whether the Petitioner was the actual shooter.  They argued that the Petitioner's

_____

fifteen.  Hicks testified at deposition that before the trial he investigated the Petitioner's involvement in the crime, including interviews with potential witnesses.  He did not perform any mitigation investigation, nor any other additional investigation, during or after the trial.  Dr. Schauer concluded that the Petitioner had a borderline IQ, with possible attention deficit disorder and/or depression.  She recommended an intervention program with remedial skill training to address his needs.

involvement was less than that of the co-defendants, so proportionality principles warranted a sentence other than execution.  Counsel further stated that to present mitigation evidence would undermine that strategy by opening the door for the State to bring out past crimes, including the armed robberies,  and other bad acts.  They wanted to avoid a situation in which the Petitioner would be portrayed as a cold-blooded, habitual criminal.  (Hearing Tr. at 21-26, 36-38.)

Mr. D'Angelo testified that the Petitioner appeared lucid during trial and was able to understand and participate in his defense.  There was no indication of any adverse mental condition, so counsel never requested any pre-trial psychological evaluation. (Hearing Tr. at 33-34.)

Hall, a licensed social worker, testified as a mitigation specialist.  She reviewed purported mitigation evidence gathered by others in preparation for the hearing in this Court, but she did not participate in the Petitioner's trial and direct appeal.  She also personally never interviewed the Petitioner or any of his family members.  She testified as to the general role of a mitigation specialist in gathering background information that could constitute potential mitigation evidence during the penalty phase of a capital trial.  Such information includes records like school and medical records, and interviews with family and others who knew the subject defendant.  Additional psychological and medical evaluations might also be conducted. (Hearing Tr. at 50, 55-59, 63-64.)

Hall testified as to what she believes are the minimum requirements of a mitigation investigation.  Preferably beginning at least three months before trial, background records should be gathered, and family members should be interviewed.  In the Petitioner's case, however, nothing of the sort was done. (Hearing Tr. at 60-61.)

-14-

By Hall's testimony, the Petitioner's IQ measured as borderline between mild mental retardation and the low end of normal.  He did poorly in school and on various standardized tests.  There also was evidence of physical and sexual abuse involving both him and other family members.  A tumultuous background, however, is not uncommon for capital defendants generally.  (Hearing Tr. at 63-65, 82, 104-06.)

Dr. Smalldon testified that in June 1996, he examined the Petitioner at the behest of Petitioner's counsel.  As part of the evaluation, Dr. Smalldon reviewed various medical, court, and school records, as well as records of  interviews conducted by third parties of the Petitioner and others who knew him.  Dr. Smalldon himself interviewed the Petitioner on three occasions for a total of ten to twelve hours, and also conducted a variety of psychological tests.  Those tests included various cognitive/neuro-psychological tests that measure brain function, and various personality tests.  He also examined the Petitioner's personal and family history, which included physical and sexual abuse against him and his mother, drug abuse, and a poor relationship with his father.  (Hearing Tr. at 75-90, 93-94.)

Dr. Smalldon testified that in addition to the borderline IQ, the Petitioner was deficient in adaptive functioning (a measure of his ability to care for himself and perform everyday tasks), had approximately a fifth grade intellect, and showed signs of mild organic brain impairment. (Hearing Tr. at 90-97.)

With respect to the imposition of the death sentence, the Ohio Statute provides:

> [The trial jury] shall consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense, the history, character, and background of the offender, and all of the following factors:
>
> (1) Whether the victim of the offense induced or facilitated it;

-15-

(2) Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation;

(3) Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law;

(4) The youth of the offender;

(5) The offender's lack of a significant history of prior criminal convictions and delinquency adjudications;

(6) If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;

(7) Any other factors that are relevant to the issue of whether the offender should be sentenced to death.

O.R.C. § 2929.04(B).

The Strickland analysis applies to counsel's performance during the sentencing phase of a capital case.  Generally, counsel is obligated to investigate potential mitigating evidence and present such evidence in the trial court.  Greer v. Mitchell, 264 F.3d 663, 676-79 (6th Cir. 2001); Glenn v. Tate, 71 F.3d 1204, 1206-07 (6th Cir. 1993), cert. denied, 519 U.S. 910 (1998).  The Sixth Circuit has reversed death sentences in cases in which counsel has not done any investigation, nor presented any mitigation evidence.  See, e.g, Carter v. Bell, 218 F.3d 581, 587, 596-97 (6th Cir. 2000); Austin v. Bell, 126 F.3d 843, 848-49 (6th Cir. 1997), cert. denied, 523 U.S. 1088 (1998).  A death sentence also is reversible when trial counsel's performance was grossly deficient throughout the entire trial so as to taint the sentencing phase.  See Combs v. Coyle, 205 F.3d 269, 288-90 (6th Cir.), cert. denied, 531 U.S. 1055 (2000); Groseclose v. Bell,

-16-

130 F.3d 1161, 1169-70 (6th Cir. 1997), cert. denied, 523 U.S. 1132 (1998).

In addition, the Sixth Circuit has reversed death sentences in cases in which mitigation evidence was presented, but nonetheless was sufficiently deficient to undermine the confidence in the outcome.  See  Mapes v. Coyle, 171 F.3d 408, 426-27 (6th Cir.), cert. denied, 528 U.S. 946 (1999); Glenn, 71 F.3d at 1206-11; Skaggs v. Parker, 235 F.3d 261, 269-71 (6th Cir. 2000), cert. denied, 122 S. Ct. 322 (2001).  In each of these cases, the deficient mitigation presentation was largely due to counsel's lack of any significant investigation into the defendant's background.

Counsel, however, need not investigate and present all mitigation evidence that is theoretically available.  Counsel's performance burden is satisfied when a theory of mitigation is presented and supported by evidence.  Williams v. Coyle, 260 F.3d 684, 704-06 (6th Cir. 2001). Counsel also need not present redundant evidence.  Id. at 705.  Furthermore, counsel's strategic decision to proceed under one mitigation theory, as opposed to other potential theories, is entitled to deference.  Coleman v. Mitchell, 244 F.3d 533, 545 (6th Cir. 2001), cert. denied, 122 S. Ct. 405 (2001).  Strategic choices made even after an incomplete or limited investigation are still reasonable to the extent that professional judgments support such limitations.  Burger v. Kemp, 483 U.S. 776, 794 (1987), citing, Strickland, 466 U.S. at 690-91. Counsel also must have made reasonable decisions that render a particular investigation unnecessary.  Greer, 264 F.3d at 676; Coleman, 244 F.3d at 545; Groseclose, 130 F.3d at 1167-68.

In addition, if the state courts have considered a claim for ineffective assistance of counsel, the federal court review of the claim is governed by 28 U.S.C. § 2254(d)(1).  Thus, the federal court does not render an independent judgment and application of the Strickland test, but

-17-

rather determines whether the state court decision is contrary to or involved an unreasonable application of the Strickland test.  Bell v. Cone, 535 U.S. 685, 698-99 (2002).

On direct appeal, the state appellate court, applying Strickland, noted that counsel had spoken with certain members of the Petitioner's family and was aware of his criminal record. Copies of any pre-sentence medical or psychological examinations would have been available to the prosecution, and any negative information could have been used against the Petitioner.  The appellate court concluded that the investigation was sufficient to make the strategic choice not to present any mitigation witnesses.  The appellate court also found that while counsel did not highlight the Petitioner's young age as a mitigating factor, such error was not prejudicial because it was cured by the trial judge's instructions.  The Ohio Supreme Court upheld these findings, and the state appellate court came to the same conclusion in state post-conviction proceedings. (See Respondent's Return of Writ at 24-30.)[3]

In his Traverse, the Petitioner first argues that the state courts unreasonably applied federal law because the Ohio Supreme Court did not even cite to Strickland on direct appeal, and neither did the state appellate court during post-conviction proceedings.  These assertions are factually incorrect.  Because the Petitioner made several claims of ineffective assistance of counsel, each of the state court opinions contains a section discussing the standard for ineffective assistance of counsel generally.  Each discussion explicitly cites Strickland.  See State v. Goodwin, 84 Ohio St. 3d 331, 334 (1999); State v. Goodwin, 1999 WL 342305 (Ohio App. May 27, 1999) at *2-3.  The state courts then applied these general standards to each claim of

---

[3]      The Ohio Supreme Court exercised its discretion and declined further review on the merits during the post-conviction proceedings.

-18-

ineffective assistance in turn.  The state courts, therefore, applied the correct legal standard.

Alternatively, the Petitioner argues that the state courts applied <u>Strickland</u> unreasonably. In the petition, five specific errors of counsel are alleged: (1) counsel did not investigate and present available mitigation evidence; (2) counsel did not obtain expert psychological and sociological assistance to investigate and present mitigation evidence; (3) counsel did not obtain supporting documentary evidence for mitigation; (4) counsel argued that age should not be considered as a mitigating factor; and (5) counsel did not object to instances of prosecutorial misconduct and erroneous jury instructions during the penalty phase of the trial.

The Petitioner's first three assertions relate to the investigation and presentation of mitigation evidence.  The Court concludes that the investigation was inadequate, and the state courts' application of <u>Strickland</u> was unreasonable.  The state court opinions indicate that the Petitioner's counsel had talked to him and some of his family members, and therefore counsel was at least generally aware of his troubled background.  However, the record is scant on the details of such interviews, and Counsel never obtained relevant school, medical, and family history records.  Therefore, the information obtained by Counsel was insufficient to prepare a mitigation case or make other investigatory and strategic decisions.

Counsel also was cursorily aware of the Petitioner's prior criminal history, which they presumed included other armed robberies.  The actual juvenile record, however, contains no convictions for armed robbery.  As to some prior incidents, no charges were filed, and as to others, the Petitioner pled to lesser offenses.  Counsel, however, never reviewed the actual juvenile records nor otherwise investigated the facts underlying the alleged prior crimes. Therefore, again the information obtained by counsel was insufficient to prepare a mitigation

case or make other investigatory and strategic decisions.

In addition to the investigation, the Court concludes that the presentation of the mitigation case was deficient.  At the jury sentencing trial, Counsel presented no witnesses, which is not surprising given the lack of any meaningful investigation.   Counsel only argued there was residual doubt that the Petitioner was the shooter.  Before the Court imposed sentence, the Petitioner's Aunt spoke on his behalf.  Such a scant presentation falls below the <u>Strickland</u> standards for attorney representation.

The Petitioner in particular argues that the strategy to argue residual doubt fell below reasonable standards of legal representation.  The Court agrees.  At the outset, the Petitioner is correct that even to convict him on the capital specifications, the jury was required to find beyond a reasonable doubt that he was the shooter.  Therefore, to claim he wasn't during sentencing was a questionable strategy.

It is also unclear from the record the basis upon which Counsel could reasonably argue residual doubt.  The opinion of the Ohio Supreme Court demonstrates this.  In his first interview with police, the Petitioner confessed that he was the shooter.  Although he later recanted that statement, he admitted he was the shooter to a fellow inmate.  The two other perpetrators of the robbery identified the Petitioner as the shooter, and the victim's cousin, who also worked at the store, generally corroborated their version of events.  This Court concludes, therefore, that the state courts unreasonably applied <u>Strickland</u> when they accepted residual doubt as a viable strategy, particularly when there was no meaningful investigation into other potential mitigation theories.

The Respondent argues that the lack of reliance on the Petitioner's background was

-20-

reasonable because such background could be viewed as indicative of a propensity toward violence.  Evidence of a troubled background is not uniformly helpful because under certain circumstances it could demonstrate violent tendencies.  <u>Burger v. Kemp</u>, 483 U.S. 776, 793 (1987).  However, counsel did not perform any investigation sufficient to make such a strategic decision. The law in this circuit is clear that strategic decisions are only to be given deference after alternative theories are investigated.  If counsel does not even explore other reasonable alternatives, there is no strategic choice.

The Petitioner's fourth claim is that his counsel stated that  age should not be considered as a mitigating factor.  All parties agree this was error.  The Respondent argues, however, that the Petitioner was not prejudiced because the trial judge properly instructed the jury that the Petitioner's youth was a mitigating factor.  Alone, this error of counsel would not warrant relief given the trial judge's proper instruction.  However, when viewed in the context of counsel's overall performance, this error is one more indication that such performance fellow below reasonable standards.[4]

For the foregoing reasons, the Court concludes that the state courts unreasonably applied <u>Strickland</u>.  The performance of the Petitioner's counsel fell below applicable standards, and the Petitioner was prejudiced because he was denied any meaningful opportunity to present a mitigation case.  Accordingly, his First Ground for Relief has merit and requires this Court to vacate the death sentence.

---

[4]     In his fifth basis for ineffective assistance of counsel during the penalty phase, the Petitioner asserts that his counsel erred by not objecting to alleged prosecutorial misconduct and erroneous jury instructions.  This claim overlaps with other Grounds for Relief, and therefore is addressed in subsequent sections.

2.  <u>Ineffective Assistance During the Guilt Phase</u>

In his Second Ground for Relief, the Petitioner asserts that his counsel provided ineffective assistance during the guilt phase of his trial by conceding guilt in order to focus upon the penalty phase.[5]  On direct appeal, the state appellate court rejected this claim with little discussion.  The Ohio Supreme Court, after a more thorough analysis under <u>Strickland</u>, concluded that given the overwhelming evidence, the concession of guilt was appropriate  to preserve the credibility of any defense during the penalty phase.  The Petitioner also was not prejudiced because the evidence of guilt was overwhelming.  <u>Goodwin</u>, 84 Ohio St. 3d at 338-39.  The Court concludes that the Ohio Supreme Court's analysis was not an unreasonable application of <u>Strickland</u>.

The Petitioner argues that his counsel misconstrued Ohio's aider and abettor law, and thereby conceded not only participation in the robbery, but also the death penalty specifications.  The Court disagrees.  Under Ohio law, one who aids and abets another is to be prosecuted as if he were the principal offender.  O.R.C. § 2903.03(F).   However, one so convicted is not deemed a principal offender for the purposes of imposing the death penalty pursuant to O.R.C. § 2929.04(A)(7).  It is clear both from the opening statement and closing arguments, counsel conceded only the Petitioner's participation in the robbery.  Counsel, however,  explicitly maintained that the Petitioner was *not* the actual shooter, <u>i.e.,</u> he was not the principal offender.  The Petitioner does not consider his counsel's concessions in context.  Counsel stated in the opening statement that "This is about sending the right person to the electric chair."  He further

---

[5]    The Petitioner asserts additional arguments for ineffective assistance of counsel during the guilt phase.  These claims overlap with other Grounds for Relief, and therefore are addressed in subsequent sections.

stated that "you, I don't believe, are going to convict him as the killer of the unfortunate store-keeper."  In closing arguments counsel argued that the evidence showed that "[co-defendant] Padgett more likely is the one who shot Mustafa".

Accordingly, the record is devoid of any moment when counsel conceded the death penalty specifications.  Counsel conceded only the Petitioner's involvement in the robbery, about which the evidence was overwhelming.  The Court, therefore, agrees with the conclusion of the Ohio Supreme Court that the Petitioner's counsel did not commit any error, and the scope of concessions constituted a reasonable strategic decision under the circumstances.  The Petitioner's Second Ground for Relief lacks merit.

C.  <u>Weighing Aggravating and Mitigating Circumstances</u>

In his Third and Fourth Grounds for Relief, the Petitioner claims that the jury (pursuant to the jury instructions) and the trial court unconstitutionally weighed the aggravating circumstances over the mitigating circumstances.  Specifically, he asserts that aggravating circumstances from separate counts were improperly weighed against a single set of mitigating circumstances.  Relatedly, as part of his First Ground for Relief, the Petitioner alleges that his counsel provided ineffective assistance by not objecting to the erroneous jury instructions.

On direct appeal, both the state appellate court and the Ohio Supreme Court agreed with the Petitioner that the trial court erred in grouping aggravating circumstances across separate counts of aggravated murder.  However, O.R.C. § 2929.05 provides that on direct appeal of a death sentence, the state appellate court and the Ohio Supreme Court:

> shall review and independently weigh all of the facts and other evidence disclosed in the record in the case and consider the offense and the offender to determine whether the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors in the

case, and whether the sentence of death is appropriate.

Such an independent review occurred.  In particular, the state courts noted that the aggravating circumstance in both counts was the same, so grouping the counts together could not have prejudiced the Petitioner. He does not assert any constitutional error with respect to the conduct of the appellate and Supreme Courts.  Accordingly, he was not prejudiced by either the trial court or his counsel's failure to object.  The Third and Fourth Grounds for Relief lack merit.

D. Prosecutorial Misconduct

In his Fifth Ground for Relief, the Petitioner asserts that his constitutional rights were violated due to prosecutorial misconduct.  He argues that in pursuing the death sentence, the prosecutor improperly portrayed the victim as a man of good character while at the same time disparaging the character of the Petitioner.  The prosecution also made references to the suffering of the victim and his family.  The Petitioner argues that by doing so, the prosecution interjected non-statutory aggravating factors into the case.  He also claims that the prosecutor improperly implied that he had personal knowledge that the Petitioner shot the victim because the co-defendants otherwise could not have entered guilty pleas.  Relatedly, as part of his First and Second Grounds for Relief, the Petitioner alleges that his counsel provided ineffective assistance by not objecting to the purported misconduct.

The determination of prosecutorial misconduct is a two-step process.  First, the Court determines whether the challenged statements were indeed improper.  If so, relief will be granted only if the improper comments were flagrant.  Factors to determine flagrancy include: (1) whether the statements tended to mislead the jury or prejudice the defendant; (2) whether the statements were isolated or among a series of improper statements; (3) whether the statements

-24-

were deliberately or accidentally before the jury; and (4) the total strength of the evidence against the accused.  Boyle v. Million, 201 F.3d 711, 717 (6th Cir. 2000); United States v. Francis, 170 F.3d 546, 549-50 (6th Cir. 1999), both citing, United States v. Carroll, 26 F.3d 1380, 1385-86 (6th Cir. 1994).  The misconduct must be so egregious as to render the trial fundamentally unfair considering the totality of circumstances.  Buell v. Mitchell, 274 F.3d 337, 364 (6th Cir. 2001).

Even assuming that the prosecutor's comments were improper, the Petitioner cannot demonstrate that the comments were flagrant.  The statements were confined to a small portion of the closing arguments.  Therefore, the statements were not pervasive so as to undermine the trial or mislead the jury.  In addition, the strength of the evidence against the Petitioner weighs heavily against a finding of flagrancy.

With respect to the specific comments, the Petitioner first relies on statements regarding the victim's character.  The Court agrees with the Ohio Supreme Court that such statements were little more than characterizing Mr. Mustafa as an innocent victim.  See Goodwin, 84 Ohio St. 3d at 349.  Similarly, the allegedly disparaging remarks about the Petitioner as being "selfish, greedy, cowardly" are consistent with the brutality and nature of the crime and within the wide latitude given prosecutors in closing argument.  In addition, the remarks about the suffering of the victim and his family are minor and insufficient to warrant reversal.

The Petitioner also is not entitled to relief because the prosecutor allegedly conveyed that he had personal knowledge that the Petitioner was the shooter.  Prosecutorial comments do not rise to the level of misconduct if they are based on reasonable inferences from the record, and are not simply the prosecutor's own opinion.  Greer v. Mitchell, 264 F.3d 663, 683 (6th Cir. 2001).

There was ample evidence by which the jury could conclude that the Petitioner was the shooter. Therefore, it was not improper for the prosecution to make statements to that effect in its closing arguments.  Indeed, that the Petitioner was the shooter constituted the prosecution's theory of the case.

Finally, the arguments for misconduct relate primarily to the weighing of the aggravating circumstances against the mitigating circumstances.  The Petitioner alleges that the prosecutorial misconduct caused the jury to consider non-statutory aggravating circumstances in sentencing. As stated above, the state appellate and Ohio Supreme Courts conducted an independent weighing of the circumstances pursuant to O.R.C. § 2929.05.  Accordingly, any alleged misconduct could not have prejudiced the Petitioner.  The Fifth Ground for Relief lacks merit.

E. Jury Selection

In his Sixth Ground for Relief, the Petitioner asserts that his constitutional rights were violated when the trial court permitted certain jurors to hear the case.  One juror indicated that she  has a "problem seeing blood", and the evidence was to include gruesome photographs.  A second juror indicated that he was dissatisfied with the sentence given to a man convicted of molesting his daughter, and he generally expressed a favorable opinion of capital punishment. Both jurors claimed they could still be fair.    As part of his Second Ground for Relief, the Petitioner alleges that his counsel provided ineffective assistance by not moving to dismiss these jurors for cause, nor exercising peremptory challenges.

The standard for determining whether a juror is fit to sit in a capital case is whether the juror's views would prevent or substantially impair the performance of his duties.  Jurors should be removed if they either never would, or automatically would, impose the death penalty upon a

-26-

finding of guilt.  Morgan v. Illinois, 504 U.S. 719, 728 (1992), citing, Wainwright v. Witt, 469 U.S. 412, 424 (1985).  The Court concludes that nothing in the voir dire demonstrates that either of the challenged jurors was substantially impaired in fulfilling the juror oath.

With respect to the first juror, although she had an aversion to blood, her answers indicate that she could properly consider the evidence, including the photographs.  In addition, the aversion to blood stemmed from merely being squeamish and did not present a bias toward either side in particular.  Indeed, it was the prosecution who sought to exclude her for cause.  The Court concludes that the voir dire questioning was sufficiently detailed and focused to uphold the trial court's decision to retain this juror.

With respect to the second juror, he was dissatisfied that the man who molested his daughter served so little time (eleven months).  He also had a favorable view of the death penalty generally.  He indicated, however, that he could fairly serve, and many of his other answers demonstrate is ability to be fair.  He disavowed an "eye for an eye" philosophy and expressed a willingness to impose a life sentence if required by law.  It is impossible to find jurors who have absolutely no opinion on an issue as controversial as the death penalty.  The juror's opinions here do not demonstrate an absolute position warranting automatic exclusion under Morgan, and the totality of his answers demonstrate that he was not substantially impaired in fulfilling his duties.  The Sixth Ground for Relief lacks merit.

F.  Victim's Family's Request for the Death Penalty

In his Seventh Ground for Relief, the Petitioner asserts that his constitutional rights were violated when the trial court considered the request of the victim's family for imposition of the death penalty.  No family members actually testified at the sentencing hearing.  Rather, the

prosecution told the trial judge that the victim's brother agreed with the jury verdict and the recommendation of the death sentence.

States constitutionally may permit evidence in a capital case regarding the impact upon a victim or his family.  <u>Payne v. Tennessee</u>, 501 U.S. 808, 827 (1991).  However, opinions by the victim's family regarding the crime and appropriate sentence are impermissible.  <u>Id</u>. at 830 n. 2, <u>citing</u>, <u>Booth v. Maryland</u>, 482 U.S. 496 (1987).

To the extent the prosecutor's statement was impermissible, any error was harmless and the Petitioner was not prejudiced.  The jury never heard the opinion, and the trial judge did not rely upon it in his opinion imposing the sentence.  In addition, the state appellate and Ohio Supreme Courts cured any purported error in their independent review pursuant to O.R.C. § 2929.05.  Accordingly, the Seventh Ground for Relief lacks merit.

G.  <u>Sufficiency of the Evidence</u>

In his Eight Ground for Relief, the Petitioner asserts that his constitutional rights were violated because his conviction stemmed from insufficient evidence.  Specifically, he asserts that the evidence was insufficient for a jury to conclude that the killing occurred pursuant to a deliberate plan, and thus was not perpetrated with prior calculation and design.

The Petitioner's claim of insufficient evidence lacks merit.  In a federal habeas proceeding, relief for insufficient evidence is warranted only if, viewing the evidence in the light most favorable to the prosecution, no reasonable trier of fact could have found proof  beyond a reasonable doubt.  <u>Jackson v. Virginia</u>, 443 U.S. 307, 324 (1979); <u>Gall v. Parker</u>, 231 F.3d 265, 286 (6th Cir. 2000), <u>cert. denied</u>, 121 S. Ct. 2577 (2001); <u>Scott v. Mitchell</u>, 209 F.3d 854, 885 (6th Cir.), <u>cert. denied</u>, 531 U.S. 1021 (2000).  In determining the sufficiency of the evidence,

substantial deference is given to the decisions of the trial court.  <u>Seymour v. Walker</u>, 224 F.3d

542, 553 (6th Cir. 2000), <u>cert. denied</u>, 121 S. Ct. 1643 (2001).

 With respect to the evidence of prior calculation and design, the Ohio Supreme Court

Stated:

> While appellant contended that the shooting was unplanned and an accident, the facts speak to the contrary. The evidence presented at trial showed that appellant placed his .357 Magnum revolver to the forehead of a cooperative and unresisting victim who at that moment was standing with his arms raised above his head. It was precisely at that time that appellant pulled the trigger, causing the bullet to enter the left forehead and exit the other side, killing Mustafa Sammour instantly. Appellant did not flee the store after this cold-blooded killing; rather, he placed the gun to the head of the other clerk and continued robbing the store. It is quite clear that appellant planned the robbery, and the murder was used to further his plan. It was an action that required thought on his part to place the gun at the victim's forehead, and he took additional time to decide to pull the trigger in order to carry out a calculated plan to obtain money from the store. This was not a spur-of-the-moment accidental shooting on the part of a robber. Appellant, after shooting Mustafa Sammour, proceeded to grab the other clerk, Almohannad Sammour, point the gun at his head, and order him to go to the safe. It is readily apparent from these facts that sufficient time, reflection, and acts were involved to provide the necessary thought processes that the law requires for a finding of prior calculation and design.

<u>Goodwin</u>, 84 Ohio St. 3d at 344.  Upon a review of the record, this Court agrees with the Ohio

Supreme Court's description of the evidence, and with the conclusion that such evidence is

sufficient to show prior calculation and design.  The Eight Ground for Relief lacks merit.

 H.  <u>Jury Instructions</u>

 In his Ninth, Tenth, and Eleventh Grounds for Relief, the Petitioner asserts that his

constitutional rights were violated due to improper jury instructions.  The Petitioner claims: (1)

the definition of reasonable doubt was erroneous (Ninth Ground); (2) the definition of "cause"

improperly permitted the jury to convict the Petitioner based upon a negligence standard (Tenth

Ground); and (3) the trial court improperly did not instruct the jury on the lesser included offense

of involuntary manslaughter (Eleventh Ground).  In addition, as part of his Second Ground for

-29-

Relief, the Petitioner alleges that his counsel provided ineffective assistance by not objecting to these jury instructions.

With respect to reasonable doubt, the trial court read Ohio's statutory definition contained in O.R.C. § 2901.05(D), which has been upheld as constitutional.  See, e.g., Thomas v. Arn, 704 F.2d 865, 869 (6th Cir. 1983).  In addition, the Court agrees with the state courts' assessment that, viewed in context of the entire jury instructions, the definition of "cause" is not constitutionally infirm.  Accordingly, the Ninth and Tenth Grounds for Relief lack merit.

With respect to the lesser included offense of involuntary manslaughter, the state courts found that such an instruction was unwarranted for the same reasons they found prior calculation and design.  In particular, although the Petitioner claimed that the shooting was accidental, the evidence showed that he placed the gun against the head of the victim.  After the victim was killed, the Petitioner put the gun against the head of a second store clerk while the robbery continued.  This Court agrees that under these circumstances, the trial court was justified in not instructing the jury on involuntary manslaughter.  The Eleventh Ground for Relief lacks merit.

I.  Constitutionality of the Ohio Death Penalty Statute

In his Twelfth Ground for Relief, the Petitioner asserts that Ohio's death penalty statute is unconstitutional, both on its face and in the manner by which it was applied to him.   Although he asserts that the statute was applied unconstitutionally as to him, all the specific arguments in the petition relate to the statutory scheme generally.  The Sixth Circuit has rejected comparable arguments on several occasions.  See, e.g., Buell v. Mitchell, 274 F.3d 337, 367-68 (6th Cir. 2001); Greer v. Mitchell, 264 F.3d 663, 690-91 (6th Cir. 2001); Coleman v. Mitchell, 268 F.3d 417, 440-44 (6th Cir. 2001), cert. denied, 535 U.S. 1031 (2002).  The Petitioner presents no

grounds for invalidating the statute in view of this controlling authority.   Accordingly, the

Twelfth Ground for Relief lacks merit.

IV.  <u>CONCLUSION</u>

For the foregoing reasons, this Petition For Writ of Habeas Corpus is GRANTED IN

PART and DENIED IN PART.  The petition is granted as to the First Ground For Relief, the

claim for ineffective assistance of counsel during the penalty phase.  The petition is denied in all

other respects.

Accordingly, the Petitioner's convictions are affirmed, but his death sentence is vacated

and this action is hereby remanded to the Court of Common Pleas for Cuyahoga Count, Ohio for

resentencing consistent with this opinion.  The Court denies a certificate of appealability to the

Petitioner as to all issues on which he did not prevail.  <u>See</u> Federal Rule of Appellate Procedure

23(b); 28 U.S.C. § 2253(c).   The Petitioner may proceed in any appeal *in forma pauperis*.  <u>See</u>

28 U.S.C. 1915(a)(3).

IT IS SO ORDERED.

Issued: March 22, 2006                              <u>     s/ John M. Manos          </u>
                                                        UNITED STATES DISTRICT JUDGE